IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VAHID SEDGHI,
    *Plaintiff,*

v.

PATCHLINK CORP.,
    *Defendant.*

Civil Action No.: ELH-07-01636

**MEMORANDUM OPINION**

    Vahid Sedghi, plaintiff, brought suit against his former employer, PatchLink Corporation ("PatchLink"),[1] defendant, an Arizona software company, claiming PatchLink failed to honor an oral promise made in 2004 to pay Sedghi a commission of 1% on all of PatchLink's sales.[2] Seeking damages in excess of $600,000, Sedghi brought claims for breach of contract, loss of commission under the Maryland Wage Payment and Collection Law, loss of commission under the Wholesale Sales Representatives Statute, unjust enrichment, fraud/intentional misrepresentation, negligent misrepresentation, and promissory estoppel.[3]

    On September 30, 2010, the Honorable Judge J. Frederick Motz, to whom this case was previously assigned, considered the parties' cross-motions for summary judgment, and granted defendant's motion for summary judgment as to all claims (ECF 107). *Sedghi v. PatchLink Corp.,* No. JFM–07–1636, 2010 WL 3895472 (D. Md. Sept. 30, 2010). On appeal, the Court of Appeals for the Fourth Circuit upheld Judge Motz's rulings, with the exception of his disposition

---

[1] PatchLink is now known as Lumension Security, Inc. Defendant uses the spelling "Patchlink," while plaintiff uses the spelling "PatchLink." I will use "PatchLink," as that is the spelling used by Judge Motz, to whom the case was previously assigned, and the Fourth Circuit, in their opinions regarding this case.

[2] Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. §§ 1332(a).

[3] In 2009, plaintiff dismissed claims under 42 U.S.C. § 1981 and Title VII.

of the promissory estoppel claim. With regard to that claim, the Fourth Circuit reversed and remanded for further proceedings (ECF 119). *Sedghi v. PatchLink Corp.*, No. 10–2229, 2011 WL 2938069 (4th Cir. July 22, 2011). Subsequently, the case was transferred to me.

On remand, defendant filed a "Motion To Strike Jury Demand And Supporting Memorandum" ("Motion," ECF 128), as to the promissory estoppel claim. Plaintiff opposes the Motion, insisting that he is entitled to a jury trial on that claim. *See* "Plaintiff's Response In Opposition To Defendant's 'Motion To Strike Request For Jury Trial'" ("Opposition," ECF 131); "Memorandum Of Grounds And Authorities In Support Of Plaintiff's Response In Opposition To Defendant's 'Motion To Strike Request For Jury Trial'" ("Opposition Memo," ECF 131-1).[4] In response to plaintiff's Opposition, defendant submitted a "Reply In Support Of PatchLink's Motion To Strike Jury Demand" ("Reply," ECF 132).

The issues have been fully briefed and the Court rules now pursuant to Local Rule 105.6, no hearing being necessary.

**Factual and Procedural Background**[5]

PatchLink was founded in 1999 by Sean Moshir ("Sean") and managed by Sean and his brother, Kourosh Moshir ("Kourosh").[6] In 2004, after a venture capital investment in PatchLink of about $35 million, Sean asked plaintiff, a college friend, to join the company as Director of Sales Engineering. *See* "Memorandum Of Law In Support Of Defendant PatchLink Corporation's Motion For Summary Judgment" ("MSJ Memo," ECF 77) at 1-2. On September

---

[4] Plaintiff has appended to his Opposition Memo a copy of *Allen v. Citimortgage, Inc.*, No. CCB-10-2740, 2011 WL 3425665 (D. Md. Aug. 04, 2011).

[5] The statement of facts that follows has been heavily drawn from Judge Motz's opinion with respect to the defendant's summary judgment motion.

[6] I shall use the first names of the Moshirs merely to distinguish them.

3, 2004, Plaintiff signed the company's standard employment agreement. MSJ Memo, at Exh. 5. The compensation portion of the contract states, *id.*:

> a. As compensation for the services provided by employee under this AGREEMENT, EMPLOYER will pay EMPLOYEE an initial annual salary of $135,000 dollars. . . .
> b. Employer will provide N/A stock option to the employee. . . .
> c. Commission is paid according to PatchLink sales policy.
> d. There are no other compensation, incentive, bonuses, payments, stocks, deferred payments, deferred salary, stock options or any other payment due to the employee other than what is set forth in this agreement unless otherwise added as amendment to this contact [sic] and signed by both the EMPLOYEE and the president of the company.

The language about commissions, set forth in ¶ "c," was used in employment contracts for a range of employees, many of whom were not eligible for commissions. MSJ Memo at 4. At least some employees who qualified for commissions had clearly defined commission plans in writing. *Id.*

According to plaintiff, defendant was to pay commissions pursuant to the PatchLink Sales Policy, referenced in ¶ "c." "Second Amended Complaint" ("Complaint," ECF 27) ¶ 11. Therefore, in January 2006, plaintiff asked Senior Vice President Richard Halavka and Sean for a copy of the policy. *Id.* ¶ 12. Plaintiff claims that Mr. Halavka and Sean advised him "that the company would get back to [him] regarding payment for the commissions," *id.* ¶¶ 14, 16, and that Sean "advised Plaintiff that accounting is doing the paperwork for the financing of the commissions." *Id.* ¶ 15.

During plaintiff's employment, several changes in his compensation were memorialized in documents placed in his personnel file, pursuant to ¶ "d" of his contract, including eligibility for a bonus, a pay increase, and stock options. MSJ Memo at 2-3. Plaintiff alleges, however, that in September 2004 Sean also agreed to pay plaintiff a commission of one percent of "all sales." *Id.* at 4-5. Plaintiff was to be paid this commission upon completion of his first year of

work for the company, at which point they would "hammer out a new compensation package." *Id.* at 5. Although no writings memorialized this alleged change to plaintiff's employment contract, *id.*, both Sean and Kourosh corroborated plaintiff's claim in their deposition testimony. Plaintiff contends that, "[a]t the close of the Second Quarter of 2005, [Sean] advised Plaintiff that . . . [Sean would] take care of the commissions owed to date in October, 2005." Complaint ¶ 18.

According to plaintiff, Sean was terminated by PatchLink in September 2005. *Id.* ¶ 19. Around that time, plaintiff wrote to PatchLink's new CEO, Corey Smith, requesting payment for overtime work, reimbursement of unpaid expenses, and the immediate vesting of his stock options. MSJ Memo at 6. Although plaintiff did not mention sales commissions in that initial request, *id.*, plaintiff avers that he repeatedly asked Smith about his commissions. Complaint ¶ 21. Smith initially declined to pay plaintiff overtime or vest his stock options, but did request that Sedghi promptly submit his expenses for payment. MSJ Memo at 6. When plaintiff pressed the issues of overtime and the stock options, Smith instructed the company to pay plaintiff a corporate management bonus of $5,000. *Id.*

On October 31, 2005, plaintiff began working under Carl Lytikainen, PatchLink's new Vice President of Technical Services. *Id.* at 7. Just three days after Lytikainen began working at PatchLink, plaintiff asked to speak with him about compensation. *Id.* Plaintiff did not mention commissions in his emails to Lytikainen, but Lytikainen confirmed in his deposition testimony that they were discussed. *Id.*; *see also* MSJ Memo, Exh. 26. Plaintiff's version accords with defendant's. He states: "Plaintiff . . . approached Mr. Lytikainen and advised him that [Sean] told Plaintiff [PatchLink would] pay Plaintiff's sales commissions and upscale his compensation package in October of 2005." Complaint ¶ 25. Lytikainen stated that he "asked [Sedghi] to . . .

show some documentation" to substantiate Sedghi's claim that he was owed commissions.  MSJ Memo, Exh. 26, at 19:3-4.  However, as plaintiff was unable to produce such documentation, he was not paid commissions at that time.  *Id.*  Plaintiff asserts that he reiterated his request for commissions to Lytikainen, "as well as others within PatchLink."  Complaint ¶ 27.

In early 2006, PatchLink increased Plaintiff's base pay and added a provision to his compensation agreement allowing him to earn up to fifteen percent of his base pay as a bonus. MSJ Memo at 8.  Plaintiff was unhappy with this new plan, however, and emailed Lytikainen to demand payment for 800 overtime hours from the previous year and payment based on "[the] commission plan that was discussed with the previous management and the previous CEO (Corey Smith)."  *Id.*; *Id.,* Exh. 24.  In that email, plaintiff provided no description of the basis for the requested commission, the rate of the commission, or other details—he merely referred to "my commission plan."  *Id.* at 8; *Id.,* Exh. 24.  Given the lack of documentation supporting Sedghi's assertion that he was entitled to a commission plan, Lytikainen declined to pay plaintiff a commission.  *Id.* at 8.

In January 2006, plaintiff's job title changed to Director of Professional Services. Complaint ¶ 28.  But, plaintiff was informed that the original contract of September 3, 2004, would remain in place, with the same terms and conditions.  *Id.* ¶ 29.  Plaintiff alleges that he continued to ask for "his commissions" for the remainder of 2006.  *Id.* ¶ 34.  Defendant contends that in October 2006 plaintiff again "raised a concern" and expressed "frustration" about the perceived inadequacy of his compensation.  MSJ Memo at 8.  Defendant asserts that plaintiff did not raise the issue of commissions at that time, but disputed whether his bonus was to be paid quarterly or biannually.  *Id.*

In the spring of 2007, the company decided to restructure plaintiff's position because he was technically a supervisor, but none of his supervisees operated in the same region. *Id.* PatchLink offered plaintiff a choice between a severance package or a different position, which would have reduced his base salary but given him a commission package that defendant alleges would have increased plaintiff's total compensation. *Id.* Negotiations stretched over a period of weeks. *Id.* According to the defendant, on April 6, 2007, in the course of negotiations, plaintiff asserted that he was entitled to a commission of one percent of all sales. *Id.* at 9.

No agreement was reached, and plaintiff alleges he was terminated.[7] Complaint ¶ 44. This suit followed. As noted, plaintiff lodged a number of claims; only the promissory estoppel claim remains. The parties disagree about whether plaintiff is entitled to a jury trial with regard to that claim.

### Discussion

Pursuant to FED.R.CIV.P. 39(a)(2),[8] defendant has moved to strike plaintiff's jury demand as to the promissory estoppel claim. Claiming that the claim is equitable, defendant maintains that plaintiff has no statutory or constitutional right to a jury trial. Motion at 1-3.

Plaintiff disagrees with defendant's position, asserting: "The right to jury trial in promissory estoppel claims is well-recognized in this Circuit." Opposition Memo at 12. According to plaintiff, "the right to a jury trial depends on the nature of the *remedy* sought," and "not merely on the classification of the claim as 'equitable' or 'legal' in nature." Opposition at 2 (emphasis in original). Noting that plaintiff has consistently sought monetary damages, plaintiff

---

[7] In its "Answer To Second Amended Complaint And Affirmative Defenses" (ECF 31), defendant denies that plaintiff was terminated. *Id.* at 6 ¶ 44. But, no alternative account of plaintiff's departure from the company has been given.

[8] Rule 39(a)(2) provides that, when a jury trial is demanded in accordance with FED. R. CIV. P. 38, the trial "must be by jury unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial."

insists that, in Maryland, this is sufficient to classify a cause of action as "legal," so as to trigger the right to a trial by jury. *Id.* at 3.[9]

"[T]he right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions." *Simler v. Conner*, 372 U.S. 221, 222 (1963). Defendant is essentially correct in stating that there is no jury trial right with regard to equitable claims. Although promissory estoppel is often regarded as equitable, it is not as immediately apparent as defendant would suggest that such a claim cannot be tried to a jury. "[T]he characterization of [a] state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law." *Id.*

In order to ascertain whether a claim is legal or equitable, "the Court must examine both the nature of the action and . . . the remedy sought. First, we compare the statutory action to

---

[9] Plaintiff does not specify the basis for his claim that Maryland law applies here. In its Reply, defendant argues at length that Arizona law applies to plaintiff's promissory estoppel claim. Reply at 4-7.

Notably, Judge Motz applied Maryland law as to the promissory estoppel claim, "because the Fourth Circuit has characterized a claim for promissory estoppel as one in tort, *see Jordan v. Alt. Res. Corp.,* 458 F.3d 332, 348 (4th Cir. 2006), and . . . the law of the forum state probably applies to a tort claim." *Sedghi v. Patchlink Corp.*, No. JFM–07–1636, 2010 WL 3895472, at *7 (D. Md. Sept. 30, 2010). He added: "In any event, I believe that it is prudent to apply Maryland law because that is the law for which Plaintiff argues, and I am ruling against Plaintiff on the claim." *Id.* But, the Fourth Circuit did not address the choice of law issue. Therefore, the mandate rule does not apply. *See U.S. v. Bell*, 5 F.3d 64 (4th Cir. 1993) ("[The] 'mandate rule' is. . . a 'specific application of the law of the case doctrine' . . . [which] compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.").

However, I need not make a choice of law determination. In a footnote in its Motion, PatchLink argues that "Arizona law should apply to the promissory estoppel claim," but concedes that, "[f]or the purposes of this motion . . . a choice of law determination need not be made, as the claim is equitable in nature in both jurisdictions." Motion at 3 n.1. Moreover, apart from the similarities between Maryland and Arizona law as to promissory estoppel, plaintiff's right to a jury trial must be assessed in light of federal law.

- 7 -

18th-century actions brought in the courts of England prior to the merger of the courts of law and equity . . . . Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull v. United States,* 481 U.S. 412, 417-18 (1987) (internal citations omitted). Of import here, "[t]he second stage of this analysis is more important than the first." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989). In addition, "[t]he Court has … considered the practical limitations of a jury trial and its functional compatibility with proceedings outside of traditional courts of law in holding that the Seventh Amendment is not applicable to administrative proceedings. . . . But the Court has not used these considerations as an independent basis for extending the right to a jury trial under the Seventh Amendment." *Tull,* 481 U.S. at 418 n. 4.

The doctrine of promissory estoppel defies easy characterization. *See, e.g., Big Bear Import Brokers, Inc. v. LAI Game Sales, Inc*., No. CV-08-2256-PHX-DGC, 2010 WL 729208, at *5 n. 4 (D. Ariz. Mar. 02, 2010) ("It is not clear that [plaintiff] is entitled to a jury trial on its promissory estoppel claim. . . . The parties should address this issue in their proposed final pretrial order.").[10] It seems that the question of entitlement to a jury trial with respect to a claim for promissory estoppel rarely arises, because it is usually coupled with other claims, for which the jury trial right is well established. *See, e.g., Berry v. WorldWide Language Resources, Inc.*, No. 1:08–cv–00438–JAW, 2011 WL 4336714 (D.Me. Sept. 15, 2011) (resolving promissory estoppel claim by a jury trial, but in conjunction with plaintiff's breach of contract claim). On other occasions, the question is disposed of summarily, with little detail. *See, e.g., Nimrod Marketing (Overseas) Ltd. v. Texas Energy Inv. Corp.*, 769 F.2d 1076, 1080 (5th Cir. 1985)

---

[10] This case settled before the issue was resolved.

("Promissory estoppel is an equitable form of action in which equitable rights alone are recognized. . . .Defendants had no right to trial by jury").[11]

I have not located clear authority from the Fourth Circuit. However, it appears that jury trials are typically contemplated with respect to promissory estoppel claims. *See, e.g., Nguyen v. CNA Corp.*, 44 F.3d 234, 241 (4th Cir. 1995) (concluding that, as "the facts in this case do not create a genuine issue of fact upon which a reasonable *jury* could find in Nguyen's favor," the trial court "did not err in granting summary judgment . . . on the promissory estoppel claim") (emphasis added); *Lane Const. Corp. v. Cardinal Industries, Inc.*, 978 F.2d 1255 (4th Cir. 1992) (affirming a jury verdict awarding damages to plaintiff with respect to a promissory estoppel action); *see also Young v. Antar*, No. WDQ-08-1912, 2010 WL 2039091, at *5 (D. Md. May 20, 2010) (denying defendant's motion for summary judgment with respect to plaintiff's promissory estoppel claim because "[a] reasonable *jury* could conclude that Antar's promise should be enforced") (emphasis added).

*Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 824 (2d Cir. 1994), provides guidance. At issue in that case was defendant Fairchild Weston Systems, Inc.'s plan to sell military surveillance systems to China. *Id.* at 822. Fairchild engaged Merex, a German company, to broker the sale. *Id.* Negotiations regarding how Fairchild was to compensate Merex for its services broke down, and Fairchild eventually consummated a sale of two surveillance systems to China, without Merex's assistance. *Id.* at 823. When Fairchild refused to pay Merex, the company sued Fairchild in federal court in New York under theories of breach of contract, quantum meruit, and promissory estoppel, alleging an oral promise by Fairchild to

---

[11] *Nimrod* addressed a factually dissimilar circumstance (an action for cancellation charges and expenses resulting from a breach of a purchasing agent agreement), and, to my knowledge, has never been cited by the Fourth or Fifth Circuits for the proposition that there is no right to a jury trial with respect to promissory estoppel claims.

pay Merex a commission with respect to any direct sale to China. *Id.* In particular, "Merex sought to recover expectation damages under the alleged oral commission agreement," the sum certain of $1,680,000, representing eight percent of the price of the two surveillance systems Fairchild sold. *Id.* at 825.

The trial court determined that Merex's claims for breach of contract and quantum meruit were barred by New York's Statute of Frauds. *Id.* at 823. But, an advisory jury[12] returned a verdict in favor of Merex on the promissory estoppel claim. *Id.* Nevertheless, the court entered judgment in favor of Fairchild. *Id.* Merex appealed, challenging the decision to treat the verdict as merely advisory and insisting that promissory estoppel is a legal claim, not an equitable one, and thus the Seventh Amendment guaranteed the right to a jury trial. *Id.*

On appeal, the Second Circuit thoroughly addressed the two-step process outlined in *Tull*, discussed *supra*. It looked first to the nature of the promissory estoppel claim and its relation to actions brought in the courts of England prior to the merger of the courts of law and equity, and second to the nature of the remedy sought.

With respect to the first prong, the Court said: "Although 'promissory estoppel' *per se* was unknown to the courts of 18th-century England . . . its modern uses have historical antecedents in both law and equity." *Id.* at 824. In examining common uses of the doctrine of promissory estoppel, the Court said:

> The modern doctrine of promissory estoppel may be invoked in two situations. First, and most traditionally, the doctrine allows for the enforcement of a promise in the absence of bargained-for consideration. . . . This is known as the theory of detrimental reliance. Promissory estoppel has also become increasingly available to provide relief to a party where the contract is rendered unenforceable by operation of the Statute of Frauds. . . . Precedent for the rule that detrimental reliance may render a gratuitous promise enforceable can be found in 'the decisions of the courts of common law from the very beginnings of the action for

---

[12] *See* Fed. R. Civ. P. 39(c).

assumpsit.' . . . This would suggest a legal root for the doctrine. On the other hand, as its surname suggests, the doctrine of promissory estoppel is a direct descendent of equitable estoppel. . . . Although equitable estoppel was ultimately recognized by the courts of common law, the doctrine was first fashioned in the courts of equity. . . ."

*Id.* (internal citations omitted).

Notably, the Court concluded that "the protean doctrine of 'promissory estoppel' eludes classification as either entirely legal or entirely equitable, and the historical evidence is equivocal. It is clear, however, that both law and equity exert gravitational pulls on the doctrine, and its application in any particular case depends on the context in which it appears." *Id*. at 825. In response to this contextual inquiry, the Court reasoned: "For example, where a plaintiff sues for contract damages and uses detrimental reliance as a substitute for consideration, the analogy to actions in assumpsit (law) is compelling. By contrast, when the plaintiff uses promissory estoppel to avoid a draconian application of the Statute of Frauds, the pull of equity becomes irresistible." *Id.*

Defendant urges us to adopt this line of reasoning, and apply it to the case at bar. Defendant explains: "Here too, Plaintiff's alleged commission agreement was supported by adequate consideration (*i.e.*, payment in exchange for work he allegedly performed for PatchLink) and he brings his promissory estoppel claim to enforce an alleged promise which the court previously held is barred by the statute of frauds. . . . Accordingly, Plaintiff's claim is equitable in nature." Reply at 13.

Applying the Second Circuit's reasoning, plaintiff's promissory estoppel claim arguably sounds in equity. He asks to avert what he perceives as an injustice by upholding an alleged oral promise, because his contract claim was barred by the statute of frauds.

However, the analysis does not end there. The nature of the requested relief cannot be ignored, because the requested relief is "more important" than the nature of the claim itself. *Granfinanciera,* 492 U.S. at 42. "Money damages are, of course, the classic form of *legal* relief." *Mertens v. Hewitt Associates*, 508 U.S. 248, 255 (1993) (emphasis in original). Moreover,

> overwhelmingly, courts characterize claims according to the remedies sought rather than according to subject matter or substantive rules involved. If the remedy sought is a coercive order, the claim is equitable; if the remedy sought is a judgment to be enforced in rem by seizure of property, the claim is legal. An action for ordinary money judgment, for replevin, or for ejectment is an action at law. In contrast, a suit for injunction or one for specific performance is equitable.

DAN B. DOBBS, LAW OF REMEDIES, VOL. 1, 156-57 (2d ed., West Publishing Co. 1993).

Indeed, the United States Supreme Court has said that even traditionally equitable actions can be considered actions at law when the relief sought is in the nature of monetary damages. "'Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.'" *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (internal citation omitted) (holding that plaintiff's restitution action was legal in nature because, in spite of the traditional equitable nature of restitution, the relief sought was damages via the imposition of personal liability on the defendant, rather than the restoration to plaintiff of particular funds or property in defendant's possession). *See also Simler*, 372 U.S. at 223 (holding that "[t]he fact that the action," a suit "to determine and adjudicate the amount of fees owing to a lawyer by a client," was brought as "a declaratory judgment case should not obscure [its] essentially legal nature") (internal citations omitted).

Plaintiff insists that the nature of relief sought in the instant case is purely legal, positing: "Sedghi here does not seek _any_ equitable form of relief—'only money.'" Opposition Memo at 9 (emphasis in original). Like plaintiff in the case at bar, the plaintiff in *Merex* sought to recover a commission pursuant to an alleged oral agreement that was deemed invalid under the Statute of Frauds. The Second Circuit stated that, "[b]ecause expectation damages for breach of contract are traditionally legal in nature, the pull of law with its attendant right to a jury trial is distinctly felt." 29 F.3d at 825. Nevertheless, the Court ruled against Merex, stating, *id.* at 826:

> [W]hile we recognize the legal nature of expectation damages generally, we remain unpersuaded that Merex's prayer for money damages outweighs the undeniably equitable nature of the promissory estoppel claim as a whole, particularly where, as here, the measure of damages plaintiff seeks is inappropriate.

In characterizing plaintiff's claim for damages as "inappropriate," the Court cited the following: its discretion to mold relief "as justice requires"; a law review article arguing against the practice of awarding contract damages in cases where promissory estoppel is used to enforce an alleged promise barred by the statute of frauds; and a Second Circuit case, *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989), which held that "[p]revailing on a promissory estoppel claim … *sometimes* entitles a party only to its out-of-pocket expenses, rather than to benefit-of-the-bargain damages" (emphasis added).

Although the *Merex* Court acknowledged that it must "'giv[e] greater weight to the latter [prong],'" i.e., the relief requested, 29 F.3d at 824 (citation omitted), the Court stated: "[W]e remain unpersuaded that Merex's prayer for money damages *outweighs* the undeniably equitable nature of the promissory estoppel claim as a whole." *Id.* at 826 (emphasis added). In this case, I have concluded that the remedy sought is legal, not equitable, so that the scale tips in the other direction.

- 13 -

Moreover, the landscape appears to have changed since *Merex* was decided. As noted, the Second Circuit reasoned: "A claim for money damages, of course, constitutes 'legal' relief, for such relief was 'the traditional form of relief offered in the courts of law.' . . . But this is not always true. Restitution damages, for example, . . . are not legal in nature." *Id.* at 825 (internal citation omitted). Yet, eight years after *Merex* was decided, the Supreme Court held in *Great-West Life* that restitution damages *can* be legal in nature. 534 U.S. 204.

Furthermore, as noted, the *Merex* Court relied on its ruling in *Arcadian Phosphates*, which said: "Prevailing on a promissory estoppel claim … *sometimes* entitles a party only to its out-of-pocket expenses, rather than to benefit-of-the-bargain damages." 884 F.2d at 73 (emphasis added). However, in the case at bar, if plaintiff prevails, whether based on Maryland law or Arizona law, he would be entitled to expectation damages.

In his summary judgment ruling, Judge Motz noted: "It appears that there is no substantial difference between Arizona law and Maryland law as to a claim for promissory estoppel. Both accept the Restatement (Second) of Contracts, § 90, as governing the claim." *Sedghi,* 2010 WL 3895472, at *7. It is noteworthy that § 90(d) of the Restatement provides: "A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate." "Normal remedies" would, of course, include expectation or contract damages. Moreover, "in Maryland, promissory estoppel is an alternative means of obtaining contractual relief." *Maryland Transp. Auth. Police Lodge #34 of the Fraternal Order of Police, Inc. v. Maryland Transp. Auth.,* 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), rev'd on other grounds, *Maryland Transp. Auth. v. Maryland Transp. Auth. Police Lodge #34 of the Fraternal Order of Police, Inc.*, 420 Md. 141, 21 A.3d 1098 (2011). Under Arizona law, promissory estoppel "is a proper claim for relief as an alternative to the contract claim." *AROK*

*Construction Co. v. Indian Construction Services*, 174 Ariz. 291, 299, 848 P.2d 870, 878 (Ariz. App. 1993).

Defendant asserts that, "under Arizona law, the extent of relief under a promissory estoppel claim may be more limited than the recovery under a contract cause of action." Reply at 6. However, in support of that assertion, plaintiff cites *AROK Construction*, which *suggested*, but did not *hold*, that "the remedy under [a promissory estoppel] theory may be more limited than damages for breach of contract." *Id.* at 300, 848 P.2d at 879.[13] In turn, *AROK Construction* quoted § 90(d) of the Restatement (Second) of Contracts, which goes on to state that "relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise" and notes that "damages should not put the promisee in a better position than performance of the promise would have put him."

The damages sought by Sedghi arguably would put him in the position he would have been in had the alleged oral contract been fulfilled. In my view, in the context of this case, the "benefit-of-the-bargain" damages sought by plaintiff are "the classic form of *legal* relief." *Mertens*, 508 U.S. at 255 (emphasis in original). Particularly as "[t]he federal policy favoring jury trials is of historic and continuing strength," defendant's arguments with respect to the second prong of the requisite analysis are not persuasive; the second factor outweighs the first. *See Simler*, 372 U.S. at 222.

---

[13] The case was remanded for further proceedings.

I conclude that plaintiff is entitled to a jury trial with respect to his promissory estoppel claim. Therefore, I will deny defendant's Motion. A separate Order consistent with this Opinion follows.

Date: October 17, 2011                          /s/
                                                Ellen Lipton Hollander
                                                United States District Judge